**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

ESSICK AIR PRODUCTS, INC.                                                                          PLAINTIFF

v.                                            No. 4:16CV00858 JLH

CRANE USA INC.                                                                                          DEFENDANT

**OPINION AND ORDER**

  Crane USA Inc., and Essick Air Products, Inc., manufacture home humidifiers. The shape of Crane's DROP® ultrasonic humidifier and Essick's Aurora™ ultrasonic humidifier resembles a water drop. Crane began selling its DROP® humidifier before Essick began selling its Aurora™ humidifier. Crane claims that the shape and design of its humidifier is protected trade dress and that Essick is infringing on its trade dress by selling its Aurora™ humidifier. Essick sued Crane, seeking a declaratory judgment that the shape and design of Crane's DROP® humidifier is not trade dress, a declaratory judgment that it has not engaged in unfair competition under either federal law or Arkansas law, and damages under Arkansas law for tortious interference with business expectancies and for deceptive trade practices. Crane counterclaimed, alleging Essick violated the Lanham Act, 15 U.S.C. § 1125(a), the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-107, and the common law of Arkansas. Both parties have moved for summary judgment on whether Crane's DROP® humidifier is trade dress protected under the Lanham Act.

  A court should grant summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets that burden, the nonmoving party must come forward

with specific facts that establish a genuine dispute of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A genuine dispute of material fact exists only if the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The Court must view the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences that can be drawn from the record. *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015). If the nonmoving party fails to present evidence sufficient to establish an essential element of a claim on which that party bears the burden of proof, then the moving party is entitled to judgment as a matter of law. *Id*. The parties agree that there is no genuine dispute of material fact and the issue should be decided by summary judgment.

Until the first decade of this century, home humidifiers were shaped like boxes—square or rectangular; they were devices of utility but lacked aesthetic appeal. Crane decided to make humidifiers aesthetically appealing so they could be a part of a home's décor. In 2008, Crane began selling its DROP® humidifier, which is, as its registered trade name suggests, shaped like a teardrop or a water drop.[1] By all accounts, the product was a success. DROP® humidifier sales started at approximately 1,000 units in 2008 and grew steadily to approximately 695,000 units in 2015. The DROP® humidifier received the Housewares Design Award in 2011 and was recognized as the best

---

[1] Crane's statement of material facts says that it began selling the DROP® humidifier in 2006, but its briefs use the date 2008. At oral argument, the parties agreed that the Court should accept 2008 as the year that Crane began selling the DROP® humidifier.

baby humidifier by Reader's Favorites in *Baby & Children's Product News*.  It also appeared on the Today Show and Good Morning America.

In 2016, Essick began selling its Aurora™ humidifier, using its registered trade name, AIRCARE®.  It purchased the humidifier "off the shelf" from a Chinese manufacturer and had no role in designing the shape of the humidifier.  Essick's Aurora™ humidifier is pictured below on the left and Crane's DROP® humidifier is on the right.



The Lanham Act provides protection for registered and unregistered trademarks.  A trademark "includes any word, name, symbol, or device, or any combination thereof [that is used or intended to be used] to identify and distinguish [a person's] goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."  15 U.S.C. § 1127.  Registered trademarks are protected under section 1114.  These marks are entitled to a presumption of validity.  15 U.S.C. § 1057(b).  Unregistered marks are protected under section 1125(a), which gives a person a right to sue for the use of "any word, term,

3

name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods . . . ." 15 U.S.C. § 1125(a). The same section specifically recognizes trade dress as a protectible trade mark. *Id.* at 1125(a)(3). "Trade dress is the total image of a product, the overall impression created, not the individual features." *Aromatique, Inc., v. Gold Seal, Inc.*, 28 F.3d 863, 868 (8th Cir. 1994).

The design of the Crane DROP® humidifier is not a registered mark. Nevertheless, Crane asserts that the "overall shape and arrangement of components (base, tank and nozzle) in three distinct sections" of its DROP® humidifier is protected trade dress. To prevail on its trade dress infringement claim against Essick, Crane must show that the DROP® humidifier is (1) inherently distinctive or has acquired distinctiveness through secondary meaning; (2) nonfunctional; and (3) its imitation is likely to cause consumer confusion as to the product's source. *Gateway, Inc. v. Companion Prod., Inc.*, 384 F.3d 503, 507 (8th Cir. 2004).

Ordinarily, a trade mark either is inherently distinctive or it can acquire distinctiveness through secondary meaning. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-11, 120 S. Ct. 1339, 1343, 146 L. Ed. 2d 182 (2000). Product design trade dress, however, cannot be inherently distinctive and can only become distinct by acquiring secondary meaning. *Id.* at 212, 120 S. Ct. at 1344 (stating as a bright-line rule that "design, like color, is not inherently distinctive"). Secondary meaning occurs when "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Id.* at 211, 120 S. Ct. at 1343 (alteration in original).

Secondary meaning may be established through direct evidence, such as consumer surveys or consumer testimony, or it may be inferred from indirect evidence. *Aromatique*, 28 F.3d at 871.

4

Direct evidence is not required. *Heartland Bank v. Heartland Home Fin., Inc.*, 335 F.3d 810, 820 (8th Cir. 2003) (Smith, J., concurring). In deciding whether secondary meaning may be inferred from indirect evidence, special consideration is given to the following factors:

1. Exclusivity, length and manner of use
2. Amount and manner of advertising
3. Amount of sales and number of customers
4. Established place in the market
5. Proof of intentional copying

*Id.* at 819 (Smith, J., concurring).

According to a leading treatise on trademark law, "[i]t is particularly difficult to prove that a product design has acquired a secondary meaning." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:11.50 (5th ed. 2018). It is difficult because "product design almost invariably serves purposes other than source identification" inasmuch as "even the most unusual of product designs . . . is intended not to identify the source, but to render the product itself more useful or more appealing." *Wal-Mart Stores*, 529 U.S. at 213, 120 S. Ct. at 1344; *see also EFS Mktg., Inc. v. Russ Berrie & Co.*, 76 F.3d 487, 491 (2d Cir. 1996) (recognizing that "consumers do not associate the design of a product with a particular manufacturer as readily as they do a trademark or a product-packaging trade dress. They are more likely to be attracted to the product for the product's features, rather than for the source-identifying role the features might play."); *Duraco Prod., Inc. v. Joy Plastic Enterprises, Ltd.*, 40 F.3d 1431, 1453 (3d Cir. 1994) (explaining that "product configuration again differs dramatically from trademark and from product packaging, since the success of a particular product—especially if similar competing products exist—does not readily

lead to the inference of source identification and consumer interest in the source; it may well be that the product, inclusive of the product configuration, is itself inherently desirable, in a way that product packagings and trademarks are not"). Here, it is undisputed that the design of the DROP® humidifier serves to make the humidifier more aesthetically appealing. Crane has a "heavy burden in establishing" that the design of its DROP® humidifier has acquired secondary meaning under the Lanham Act. *See* McCarthy, *supra*, at § 8:11.50.

The question is whether the primary significance of the overall design and shape of Crane's DROP® humidifier in the minds of consumers is to identify Crane, even if consumers do not know Crane by name, rather than the humidifier itself. *See Wal-Mart Stores*, 529 U.S. at 211, 120 S. Ct. at 1343. Crane argues that the Court should infer secondary meaning because of third-party admissions, its spending on advertising, the product's notoriety, evidence that Essick copied the design, the length of its exclusive use of the design, and because of the quantity of units sold. Crane cannot meet its burden here, even when the evidence is viewed in the light most favorable to it.

Crane argues that the Court can infer that the design of the DROP® humidifier has acquired a secondary meaning because several third parties have acknowledged that Crane has a protectible trade dress. Crane cites settlement agreements into which it has entered with third parties that sold similarly shaped humidifiers, as well as conduct by other alleged infringers who terminated their sales after receiving complaints from Crane. In one settlement, the defendant agreed to the entry of a permanent injunction against selling its drop-shaped humidifiers, paid damages, and acknowledged that Crane had a protectible trade dress in the design of its DROP® humidifier. None of this evidence has probative value. That other parties who wish to sell drop-shaped humidifiers have been deterred by threat of suit hardly proves that, in the minds of the public, the primary

significance of the design of the drop-shaped humidifier is to identify the source of the product. *Cf. Wal-Mart Stores*, 529 U.S. at 214, 120 S. Ct. at 1345 (a threat of a lawsuit can deter competition, which is one reason inherent distinctiveness should not be attributed to product design). Any statement in a settlement agreement acknowledging the validity of Crane's claim of trade dress protection is "a legal conclusion for which [Crane] negotiated." *See Colt Defense, LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 710 (1st Cir. 2007). "For obvious reasons, such evidence has little, if anything, to do with the general understanding of [the design of the drop-shaped humidifier] to the relevant public." *See id*.

Crane also cites an internal Essick email reporting that a Walmart buyer identified as "Todd" refused to accept Essick's drop-shaped humidifier because it appeared to be a "knock-off" of a product he already had, apparently referring to Crane's DROP® humidifier. The statement by Todd, assuming it is not inadmissible hearsay, suggests that Essick's humidifier is a copy of Crane's humidifier, an issue that the Court addresses *infra* at 10-11.

The only evidence of Crane's advertising expenditures is the deposition testimony of Crane's marketing director, Katie Sotor. Sotor testified as follows:

> Q. Does Crane maintain an annual marketing budget?
>
> A. Yes, we do.
>
> Q. Approximately what's the size of that budget?
>
> A. Oh, my goodness.
>
> Q. Let's say in the last year if you know approximately what was the size of the budget?
>
> A. Okay, marketing budget, marketing is very large, I would say approximately 130, 150,000.

> Q.   Annually?
>
> A.   I would say that's pretty – yeah.

Crane argues from this testimony that it has spent $130,000 to $150,000 annually since 2008 advertising the DROP® humidifier. The question that Sotor answered, however, was directed to the advertising budget for the year preceding her deposition. She was deposed on March 28, 2018, so her answer related to the advertising budget for 2017. Even if her answer to the question, "Annually?", is construed to mean that Crane has spent that amount in years other than 2017, it is a matter of speculation as to how many years to which she intends to refer.

Sotor estimated that ninety percent of the budget is used to market humidifiers, and seventy percent of the ninety percent is used to market the DROP® line of humidifiers. *Id.* at 105. Using Sotor's estimates, Crane spent approximately $80,000 to $90,000 advertising the DROP® humidifier in 2017, and, presumably, similar amounts in some unspecified number of earlier years.

Sotor testified that Crane's marketing of the DROP® humidifier has focused on its 360º nozzle, and that it is easy to clean, beautiful and comes in many different colors. She testified that Crane's marketing materials do not use any words to indicate to an end user that the shape of the DROP® humidifier is Crane's trade dress. In response to the question of whether any particular words in any of Crane's marketing materials indicate to the end user that the shape of the DROP® humidifier is Crane's trade dress, she testified "I would say no."

This evidence is insufficient to support an inference that Crane's advertising has given rise to the perception in the minds of the public that the drop shape of a humidifier identifies the source of the product rather than the product itself. It is insufficient to allow the Court to draw an inference that in the minds of the consuming public the drop shape of a humidifier signifies a product that

comes from a single source, whether or not the consuming public knows the name of that source. So far as the evidence shows, the amount that Crane has spent on advertising "is probably too low to accord it much probative value." *Aromatique*, 28 F.3d at 872. Crane's advertising budget includes travel to trade shows, which "is of no relevance to a determination of whether the promoted trade dress identifies, in the minds of the consumers, the source of the product." *Id*. Furthermore, according to Sotor, Crane's advertising focuses on features of the humidifier that appeal to consumers, such as the flexibility of the nozzle, the ease with which it may be cleaned, and its attractive appearance—not to the shape as identifying its source. Advertising that promotes a product's functional features or that fails to promote an association between the product and the source does not support a finding of secondary meaning. McCarthy, *supra*, at § 7:30. Crane's marketing supports "the inference that consumers consider the claimed trade dress a desirable feature of the product and not primarily a signifier of source." *See Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir. 1995).

Crane next argues that the various awards and recognition received by the DROP® humidifier support a finding of secondary meaning. The DROP® humidifier is undeniably attractive and has been so recognized in many contexts. At most, the publicity tends to show that consumers were exposed to the product, but it does not show that consumers primarily viewed the design of the DROP® humidifier as signifying its source. *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1155 (10th Cir. 2013) ("That its products were shown on the Oprah Winfrey Show on at least one occasion is not enough to establish that consumers thereafter connected the mark and the product.").

Crane also argues that evidence that Essick copied the design of the DROP® humidifier supports a finding of secondary meaning. For purposes of the present ruling, the Court assumes that

9

Essick's Aurora™ humidifier is a copy of Crane's DROP® humidifier.[2]  Deliberate copying of a mark may be evidence of secondary meaning, but "[w]here there is a demand for a type of product, capitalizing on that demand by copying that product does not necessarily indicate that the original product has secondary meaning." *Aromatique*, 28 F.3d at 871.

Here, for two reasons, copying does not support the inference that the design of the DROP® humidifier has acquired secondary meaning.  First, that a seller of humidifiers has copied the drop-shaped design may indicate nothing more than a desire to sell an aesthetically pleasing product the shape of which (a water drop) signifies the product's humidifying purpose.  "If the particular feature is an important ingredient in the commercial success of the product, the interests in free competition permits its imitation in the absence of a patent or copyright."  *Gateway*, 384 F.3d at 508 (citation omitted).  As the Supreme Court has noted,

> Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160, 109 S. Ct. 971, 103 L. Ed. 2d 118 (1989). Allowing competitors to copy will have salutary effects in many instances.

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29, 121 S. Ct. 1255, 1260, 149 L. Ed. 2d 164 (2001).  Second, Essick conspicuously and consistently labeled its humidifier with its own trademark, which under Eighth Circuit precedent undermines any inference that can be drawn from copying.  *See Aromatique*, 28 F.3d at 871 ("The copying that was present here cannot support

---

[2] Essick denies that its humidifier is a copy of Crane's.

10

an inference of secondary meaning. . . . Gold Seal's conspicuous placement of its identifying marks must be seen as an attempt to distinguish its potpourri from Aromatique's.").

Crane also contends that the design of the DROP® humidifier should receive protection as trade dress because it was the first to introduce such a product design to the market and because it exclusively used the design for six or seven years before others entered the market with similarly shaped humidifiers. It directs the Court to 15 U.S.C. § 1052(f), which states that "[t]he Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made." However, an applicant seeking protection of a product design trade dress "cannot rely solely on the five year rule, but must produce some other evidence of the acquisition of secondary meaning." McCarthy, *supra*, at § 8:11.50. Moreover, "[t]he Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity." *TrafFix Devices*, 532 U.S. at 34, 121 S. Ct. at 1262.

Finally, Crane relies on the quantity of DROP® units that it has sold to support a finding of secondary meaning. Crane cites the dissenting opinion in *Aromatique* to support its argument that the 3,500,000 units sold indicates secondary meaning. The opinion of the court, however, held that the sales numbers alone did not indicate that consumers associated the product with its source "because something other than the secondary meaning of the trade dress may have been responsible for the success of the product." *Aromatique*, 28 F.3d at 873. In short, "[e]vidence that its products had millions of users and that its products were sold through well-known retailers does not [indicate] whether the sales were stimulated by the mark." *Water Pik*, 726 F.3d at 1154-55.

11

## CONCLUSION

Crane cannot meet its burden of showing that the design of the DROP® humidifier has acquired secondary meaning, which is to say that Crane cannot submit evidence sufficient to prove an essential element of its claim that the design is protected under the Lanham Act. The Court, therefore, need not consider the other elements—functionality and likelihood of confusion. Crane's motion for summary judgment is DENIED. Document #32. Essick's motion for summary judgment is GRANTED. Document #31. The claims asserted by Crane in its counterclaim depend on its contention that the design of the DROP® humidifier has acquired secondary meaning. Because the Court has granted Essick's motion for summary judgment on that issue, all of Crane's claims fail. Crane's counterclaim is dismissed with prejudice.

IT IS SO ORDERED this 12th day of July, 2018.

_J. Leon Holmes_
_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE